**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | **Chapter 11** |
| **In re:** | : | |
| | : | **Case No. 15-11101 (___)** |
| **BOSTON RESTAURANT ASSOCIATES, INC.** | : | |
| *et al.,* | : | **(Joint Administration Requested)** |
| | : | |
| **Debtors.**[1] | : | |
| | x | |

------------------------------------------------------------x

## <u>DECLARATION OF PETER E. SALAS IN SUPPORT OF FIRST DAY MOTIONS</u>

I, Peter E. Salas, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am a director of each of Boston Restaurant Associates, Inc. ("<u>BRA</u>") and its affiliated debtors, as debtors-in-possession (collectively, these entities are referred to as the "<u>Debtors</u>" or the "<u>Company</u>").  I was appointed to this position in October, 2002 and have served as Chairman of the Board since December 2006 and CEO since April 2013.    In those capacities, I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.      I am also President of Dolphin Mgmt. Services, Inc. ("Dolphin"), the managing general partner of Debtors' largest shareholder, Dolphin Direct Equity Partners, LP.  Prior to establishing Dolphin in 1988, I was with J.P. Morgan Investment Management, Inc. for ten years, becoming Co-manager, Small Company Fund and Director-Small Cap Research.  I received an A.B. degree in Economics from Harvard in 1978.  I also served as CEO of ACT Teleconferencing, Inc. from February 2007 to September of 2013.  I believe the business experience attributes, and skills I have gained while working in these sophisticated financial positions, together with my service as director of other public

---

[1]      The Debtors, along with the last four digits of each debtor's tax identification number, as applicable, are: Boston Restaurant Associates (2263); Pizza Regina of Kingston, Inc. (2531); Ocean, Inc. (6400); Fantail Restaurant, Inc. (6556); Regina Pizzeria at Fenway, Inc. (4457); Polcari's Inc. (5395); Polcari's of Woburn, Inc. (9677); Polcari Enterprises, Inc. (0989); Pizzeria Regina of Medford, Inc. (4952).

companies and in my capacity as controlling person of the Debtor's largest shareholder give me particular insights into the Debtors' operations and the goals of the Debtors through this bankruptcy process.

3.      As director of the Debtors, I am responsible for, among other duties and responsibilities, overseeing all aspects of the Debtors' businesses, including, without limitation, organization, human resources, marketing, sales, logistics, finance, administration, oversight and the prosecution of these chapter 11 cases.  In my capacity as director, I have general knowledge of the books and records of the Debtors, and am familiar with the Debtors' financial and operational affairs.

4.      I have worked for more than thirty years in the small business arena.  My experience includes successfully leading organizations undergoing change or transition.

5.      I submit this declaration (this "Declaration") pursuant to 28 U.S.C. §1746 in support of the Debtor's first day motions and applications filed contemporaneously herewith (collectively, the "First Day Motions").  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and I believe that the relief sought in the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with minimum disruption to their operations and minimum loss of value.

6.      Except at otherwise indicated, all the facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtors' board, management or professionals, upon information learned from my review of the relevant documents, or opinion based upon my experience and knowledge of the Debtors' operations and financial condition and my experience in the industry generally.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  Unless otherwise indicated all financial information contained herein is on a consolidated and unaudited basis.

## BACKGROUND

### Filing of Chapter 11 Cases

7.      On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      The Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.      Part I of this Declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these chapter 11 cases and Part III sets forth the relevant facts in support of the First Day Motions.

### I.      The Debtors' Business

**B.      Operations**

10.      The Debtors are leading regional owners and operators of pizzerias and restaurants in the metropolitan Boston area and New Hampshire.  As of the Petition Date, the Debtors operate 15 (fifteen) fast-service pizzerias under the "Regina Pizzeria"® name, two full-service Regina Pizza and two full-service family-style Italian-American restaurants under the "Polcari's North End"® name.  The Pizzeria Regina restaurants are famous for the Company's signature premium Neapolitan style, thin crust pizza, prepared in gas-fired brick ovens.  The original Pizzeria Regina, located in Boston's historic North End, has served, and continues to serve, the Company's premium brick oven pizza since 1926.  The Pizzeria Regina brand name and the pizza itself are hallmarks of superior and distinctive pizza in New England.

11.     The Polcari's North End restaurants are full-service Italian/American, family-style restaurants which reflect the style of the 1940s and 1950s in Boston's Italian North End neighborhood, featuring memorabilia and photographs depicting 1940s and 1950s scenes in Boston's North End, and large tables to encourage family-style dining.

12.     The predecessor corporation was incorporated in 1986.  The Company became public in 1994.  Current owners took the Company private in 1996, and since that date has continuously operated a restaurant chain which has increased over time to the present nineteen operating restaurants.

13.     The Debtors trademarks and its service marks have significant value, the most significant being (i) "Pizzeria Regina," the Regina crown design logo, and (ii) "Polcari's North End," each of which are U.S. registered trademarks owned by the Debtors.  The Debtors have  also registered with the U.S. Patent and Trademark Office "Regina," the "Polcari's" logo, "Pizzeria Regina of Boston's North End" and "Pizzeria Regina, Boston's Brick Oven Pizza" as service marks.

**C.     <u>Employees:</u>**

14.     As of the Petition Date, the Debtors employ approximately 490 employees.  Of these, approximately 11 serve in an administrative capacity.  The others serve in a management or employee capacity at the various restaurant locations owned and operated by the Debtors.

15.     The staff for a typical Pizzeria Regina fast-service restaurant consists of one general manager, two managers and approximately 8 to 10 hourly employees.  The staff of the original Pizzeria Regina consists of a general manager, two managers, and approximately 35 hourly employees.  The staff for a typical Polcari's North End restaurant consists of one general manager, two managers, one kitchen manager and approximately 40 to 60 hourly employees. Most of the Company's hourly employees are part-time personnel.  The general manager of each restaurant is primarily responsible for the day-to-day

operations of the entire restaurant and for maintaining standards of quality and performance established by the Company.

**D.**    **Locations**

16.    The Debtors operate fifteen high-volume, fast-service pizzerias, emphasizing the sale of pizza slices and modeled as self-service, take-out style dining with common area seating, typically found in mall "food courts",  under the "Regina Pizzeria"® name. In connection with these operations, the Debtors are counterparty to certain leases, at the following locations:

a.    Arsenal Mall, Watertown, MA
b.    South Shore Plaza, Braintree, MA
c.    Burlington Mall, Burlington, MA
d.    Emerald Square Mall, North Attleboro, MA
e.    Fenway, Boston, MA
f.    Faneuil Hall, Boston, MA
g.    Cape Cod Mall, Hyannis, MA
h.    Independence Mall, Kingston, MA
i.    Liberty Tree Mall, Danvers, MA
j.    Mall of New Hampshire, Manchester, NH
k.    Solomon Pond Mall, Marlboro, MA
l.    Pheasant Lane Mall, Nashua, NH
m.    North Shore Mall, Andover, MA
n.    Prudential Center, Boston, MA[2]
o.    South Station, Boston, MA

17.    The Debtors also derive revenue from a licensing agreement with an entity that runs a Pizzeria Regina at the Foxwoods Resort Casino, Ledyard, Connecticut; however the Debtors do not own or operate this restaurant and that entity is not a Debtor in these cases.

18.    The Debtors also own and operate the original North End Pizzeria Regina location, a Regina Pizza full service restaurant in Medford, Massachusetts, and two full-service family-style, Italian-American Polcari restaurants.

---

[2] The Debtors note that the landlord at the Prudential Center location has informed the Debtors that they intend to close the food court in which the Pizzeria Regina is located on June 25, 2015.

19.     The first Polcari restaurant was opened in the 1954 in the North End of Boston and subsequently closed.  In March 1995 a second one was opened in Saugus, Massachusetts and in 2000 one was opened in Woburn.

20.     A  Debtors is also 33.33% stakeholders in a restaurant operated in Allston Massachusetts under the Pizzeria Regina name (the "Allston Location") by non-debtor Pizzeria Regina of Allston, LLC. The Debtors also manage the Allston Location pursuant to a management agreement with Pizzeria Regina of Allston, LLC.

21.     The Company's principal offices are located at 48 Cummings Park, Woburn, Massachusetts 01801

22.     The Debtors operate a Commissary where pizza dough is produced for all of the Debtors' restaurants.  Centralized preparation of the dough, the key ingredient to the Debtors' signature pizza, allows for a high degree of consistency that would be more difficult to maintain at the individual restaurant locations.  All other food preparation is performed on site at the restaurant level.

23.     Purchasing is centralized through BRA for each location according to its particular needs. The Debtors negotiate directly with wholesale suppliers of certain high volume food ingredients such as cheese, tomato sauce, and flour to ensure consistent quality and freshness of products across its restaurants and to obtain competitive pricing.  These ingredients are then purchased for the Debtors by a third party independent distributor at the negotiated price and redistributed to the Debtors' restaurants. All other food ingredients and beverage products are purchased directly by the general manager of each restaurant in accordance with corporate guidelines.  Each location maintains separate books and records and is responsible for payment for all of its own purchases of inventory.

**E.**     **Cash Management**

24.     As set forth in more detail in the Debtors' Cash Management Motion (defined below) each of the Debtor's restaurant locations takes in money from sales by cash and/or credit card payments from customers.   The cash is either deposited in a local bank account in a dedicated cash deposit account or retrieved by an armored car service.   Typically, the dedicated cash deposit accounts are held at local banks located near the individual restaurant locations (i.e., a bank located in the same mall as one of the Debtors' fast-service restaurants).   Cash from the cash accounts is swept into a central operating account.  Cash from the armored car service is delivered to a counting room and then deposited into the central operating account, typically with a 2-3 day delay between pick up at the restaurant and deposit.  These funds are then used to fund operations—including payroll and inventory purchasing—at each individual restaurant.

25.     Cash from the credit card accounts typically is posted to the account on third or fourth business day after a purchase and is then swept into the centralized account on the following day. The Debtors also maintain a  money market account with Merrill Lynch which is used to fund a  payroll reserve.

**F.**     **Corporate Structure**

26.     Schedule A attached hereto generally depicts the Debtors' overall corporate structure and the relationship among the Debtor entity.

27.     Briefly, Boston Restaurant Associates, Inc., a Delaware corporation, is the 100% owner of each of the following Debtors:

    a.     Pizzeria Regina of Kingston, Inc.
    b.     Pizzeria Regina of Medford, Inc.
    c.     Polcari's, Inc.
    d.     Polcari's, of Woburn, Inc.
    e.     Polcari's Enterprises, Inc. and
    f.     Ocean, Inc.

28.     Ocean, Inc., in turn, owns 100% of Fantail Restaurant, Inc. and Pizzeria Regina at Fenway, Inc.  Dolphin Direct Equity Partners, LP owns the majority of the equity in the form of both preferred and common shares in Boston Restaurant Associates, Inc.

**G.     Lease Agreements**

29.     As noted above and set forth more fully in the Debtors' schedules and statements of financial affairs, the Debtors are lease counterparties to a number of leases for the various restaurant locations.  The Debtors plan through this case to reject a number of these leases.

30.     Specifically, over the past several months, the Company, in consultation with its professionals, began the process of reviewing and analyzing their restaurant lease portfolio and performance of each of its stores.  The Company reviewed all company-owned store locations to determine an optimal core group of "keep" stores (the "Keep Stores").  In addition to the Keep Stores, the Company identified certain stores which, despite efforts to negotiate more favorable lease terms, ultimately were designated as stores that should be closed (the "Close Stores"), and stores which were possible closures, but had the potential to remain open if more favorable lease terms could be negotiated (the "Negotiate Stores").

31.     In analyzing whether a store should be included in the group of Keep Stores the Company considered a number of factors including: (a) financial performance of the store over time; (b) EBITDA and revenue levels; (c) occupancy costs relative to EBITDA and the remaining lease term obligation; (d) same store sales figures; (e) mall type, market, and management performance; and (f) geographic location.  No one factor was necessarily considered dispositive in deciding whether a store should be included in the group of Keep Stores versus other categories, but certain factors weighed heavily in placing stores into the Close Stores category.  For instance, if a store had consistently generated significant cash losses at the store level, it was considered for the Close Stores category.

32.     After months of extensive review of the Company store portfolio and in some instances, unsuccessful efforts to renegotiate lease terms for certain stores, the Company and its professionals identified 12 ( twelve) Keep Stores, 4 (four) Close Stores and 3 (three) Negotiate Stores.   In anticipation of this filing, the Debtors closed the 4 Close Store locations and vacated the premises.

33.     Because the Debtors no longer maintain operational stores at these locations continued compliance with the terms of the Leases would be burdensome and provide no corresponding benefit to the Debtors, their estates, or the stakeholders in these chapter 11 cases.  Notably, as of the Petition Date, the Debtors continue to be obligated to pay rent under the Leases even though they have ceased operations at the respective premises.  The Debtors also are required to pay for certain property taxes, utilities, insurance and other related charges associated with the Leases.  By rejecting the Leases, the Debtors estimate that they will be able to achieve cost savings of approximately $93,000 per month in occupancy cost alone over the remaining terms of the Leases.  Therefore, immediate rejection of the Leases will prevent the estates from potentially incurring unnecessary administrative expenses associated with the Debtors' obligations under the Leases.

34.     Additionally, the Debtors with the advice of their professionals reviewed the market value of the Leases for these stores and determined that marketing these Leases for assignment or sublease to a third party would not generate any significant value for the estates as these Leases are generally at or above market rates for a pizza concept.

35.     Accordingly, the Leases constitute an unnecessary drain on the Debtors' resources and do not provide any benefit to the Debtors' estates, and, further, are not necessary to the Debtors' ongoing operations.

## H.    **Capital Structure**

36.    As of the Petition Date, the Debtors are obligated with respect to the following secured

obligations[3]:

> g.    <u>Commerce Bank & Trust Mortgage Loan</u>: a mortgage loan in the initial principal amount of $800,000, pursuant to a promissory note from BRA Nominee Trust (beneficiary) and as to which the Debtors are guarantors pursuant to that certain Multi-Party Guaranty Agreement (as amended, the "<u>MPGA</u>"), with a maturity date of July 13, 2015 that is secured by: (i) a mortgage against certain property located at (A) Unit A in the 76-78 North Margin Street Condominium, 76-78 North Margin Street, (B) Unit C in the 15 Thacher Street Condominium, 15 Thacher Street, and (C) Unit 11½ in the 13 Thacher Street Condominium, 13 Thacher Street.  The debt is amortized over 15 years and has an outstanding principal balance as of the Petition Date of approximately $515,657 (as amended the "<u>Mortgage Loan Agreement</u>"); (ii) that certain Multi-Party Security Agreement signed by the Debtors (as amended the "<u>MPSA</u>").

> h.    <u>Commerce Bank & Trust Revolving Line of Credit</u>:  a revolving line of credit from CB&T in the principal amount of $210,000.00 as evidence by that certain Loan Agreement (as amended, the "<u>Revolver Credit Agreement</u>"). The line is payable on demand.  The Revolver Credit Agreement is secured by: (i) a lien on substantially all of the Debtors' assets, including the Debtors' cash; and (ii) a guaranty from non-debtor BRA Nominee Trust as evidenced by, among other things, that certain Certificate of Trustee dated June 28, 2013 (the "<u>Certificate of Trustee</u>").

37.    As of the Petition Date, the Debtors have unsecured obligations to employees, various

trade creditors and contract counterparties  as will be described in more detail in the Debtor's Schedules

and Statements of Financial Affairs to be filed in this case.

## II.    **Events Leading to Chapter 11 Cases**

38.    The Debtors operate in a highly-competitive market, particularly in the North East region

of the country.   Factors such as price, location, food quality, service and attractiveness of facilities are

all part of the competitive landscape which is also shaped by factors beyond the Debtors' control,

including changing tastes, changing dining habits, changing population and local economic conditions.

The Debtors compete with numerous restaurants, nationally, regionally and locally owned and operated.

---

[3] The Debtors also have certain obligations to lenders secured by specific assets, for example, company car loans and office equipment loans, which will be treated in the ordinary course of business and or under a plan of reorganization.  As of the Petition Date, these obligations in the aggregate are less than $75,000 without regard to the value of the collateral securing such obligations.

Those Pizzeria Regina located in malls in particular compete with other fast-service, high volume food providers on the basis of price, value, location, menu and speed of service.  The Polcari's restaurants compete with other casual, full-service restaurants primarily on the basis of menu selection, quality, price, service, ambiance and location.

39.     One of the critical market factors the Debtors face is the changing nature of mall dining and the sometimes adverse impact those changes can have on revenue at the fast-service mall locations. In an industry that typically operates on thin margins, even small changes in sales can have significant consequences.  The Debtors have not been immune to these changes, facing high lease and operating costs that are not always met with sufficient revenues.

40.     An important part of the relief the Debtors seek through these bankruptcy cases, as will be set forth more fully in the Debtors' disclosure statement, plan and certain other pleadings filed in these cases, is the ability to restructure or reject burdensome lease obligations.  The Debtors believe that, by getting out of under-performing lease locations, they can focus more energy and resources on profitable stores and in identifying and undertaking a rational growth strategy moving forward.

### III.     First Day Motions

#### A.  Administrative Motions

    i.   *Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")*

29.     The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 cases under the lead case, "Boston Restaurant Associates, *et al*."  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 cases to indicate the joint administration of the estates.

30.     The Debtors are affiliates as that term is defined in 11 U.S.C. § 101(2) and used in Fed. R. Bankr. P. 1015(b).

31.     Joint administration of the Debtors' Chapter 11 cases is appropriate because the Debtors intend to file with this Court numerous pleadings and applications that they believe will affect each of the Debtors' cases equally, and joint administration will reduce the amount of duplicative pleadings and notice that will be filed and/or served.  Additionally, it is anticipated that one overall plan for reorganization will be proposed.  As such, the joint administration of these cases will promote the economical, efficient, and convenient administration of the Debtors' Estates.

32.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources. The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings and orders in these Chapter 11 cases will affect each Debtor and their respective estates.  The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.

33.     Moreover, each creditor can still file its claim against a particular estate.  In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these Chapter 11 cases. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative tiles.  Finally, supervision of the administrative aspects of these Chapter 11 cases by the United States Trustee for the District of Delaware will be simplified.

34.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical

12

element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Expedited Joint Administration Motion should be granted.

> ii.  *Debtors' Motion for Entry of an Order (A)Authorizing the Establishment of Procedures for Notifying Creditors of Commencement of Debtors' Chapter 11 Cases and (B) Authorizing Filing of Consolidated List of Debtors' 25 Largest Unsecured Creditors (the "<u>Consolidated Creditor Motion</u>").*

35.     In an effort to streamline the administration of these cases the Debtors request that they

be permitted to establish certain notification procedures in order to notify creditors of these chapter 11

cases.  Moreover, the Debtors seek to file a consolidated list of their top 25 creditors, as opposed to

being required to file a list of each Debtor's top 20 creditors, as doing so would consume an excessive

amount of the Debtors' scarce time and resources.  This relief will allow the Debtors to efficiently and

effectively notify their creditors of this case and related proceedings.

36.     I believe that the relief requested in the Consolidated Creditor Motion is in the best

interests of the Debtors' estates, creditors, and all other parties in interest and constitutes a critical

element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Consolidated Creditor Motion should be granted.

> iii.  *Debtors' Motion for Interim and Final Approval of Debtors' Application to Employ Nixon Peabody LLP as their Counsel as of the Petition Date (the "<u>Nixon Application</u>")*

37.     Concurrently herewith, the Debtors filed applications to retain Nixon Peabody LLP

("Nixon") as their general counsel in these bankruptcy cases.  I believe the retention of Nixon is critical

because of their experience and expertise in the practice of bankruptcy law and their familiarity with the

Debtors' operations and background.

38.     I believe that the relief requested in the Nixon Application is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in

achieving a successful prosecution of these Chapter 11 cases.  Accordingly, on behalf of the Debtors, I

respectfully request that the Nixon Application should be granted.

> iv.  *Motions to Admit (i) Victor G. Milione; (ii) Lee Harrington; (iii) Christopher M.*
> *Desiderio; and (iv) Christopher Fong Pro Hac Vice (the "*<u>Pro Hac Motions</u>*")*

39.     The Debtors have filed a series of Motions for Admission *Pro Hac Vice* for their lead

bankruptcy counsel, Victor G. Milione, Lee Harrington, Christopher M. Desiderio and Christopher

Fong, of Nixon.    As set forth in the *Pro Hac* Motions, each of these attorneys is a member in good

standing of the various state bars to which he is admitted.  Each possesses significant bankruptcy

experience and their services are essential to the successful prosecution of the Debtors' bankruptcy

cases.

40.     I believe that the relief requested in the *Pro Hac* Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in

achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I

respectfully request that the *Pro Hac* Motions should be granted.

> v.     *Debtors' Expedited Motion for Interim and Final Approval of the Debtors'*
> *Application to Employ Cross & Simon, LLC as their General Local Counsel Effective*
> *as of the Relief Date  (the "*<u>Cross & Simon Application</u>*")*

41.     Concurrently herewith, the Debtors filed applications to retain Cross & Simon, LLC

("<u>Cross & Simon</u>") as their general local counsel.  I believe the retention of Cross & Simon is critical

because of their experience and expertise in the practice of bankruptcy law and their familiarity with the

Debtors and with the requirements of local practice before this Court.

42.     I believe that the relief requested in the Cross & Simon Application is in the best interests

of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in

achieving a successful prosecution of these Chapter 11 cases.  Accordingly, on behalf of the Debtors, I

respectfully request that the Cross & Simon Application should be granted.

14

viii. *Debtors' Application for an Order Authorizing and Approving the Employment and Retention of Garden City Group, LLC as Claims, Noticing, and Balloting Agent for the Debtors and Debtors-in-Possession Effective as of the Petition Date (the "Claims, Noticing, and Balloting Agent Application")*

43.     Concurrently herewith, the Debtors filed applications to retain Garden City Group, LLC ("GCG"), as their claims, noticing, and balloting agent.  I believe the retention of GCG is critical because of the large number of creditors identified in this case and in order to comply with the notice requirements set forth in the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules.

44.     I understand that GCG is a data processing firm with extensive experience in noticing, claims processing, balloting and other administrative tasks in Chapter 11 cases.  Given the need for the services described above and GCG's expertise in providing such services, I believe that retaining GCG will expedite service of notices, streamline the claims administration and balloting processes, reduce the administrative costs associated with such tasks, and permit the Debtors to focus on patient care and reorganization efforts.

45.     Accordingly, on behalf of the Debtors, I respectfully submit that the Claims, Noticing, and Balloting Agent Application should be granted.

**B.  Operational Motions Seeking Immediate Relief**

i. *Motion for Interim and Final Orders:  (I) Authorizing, But Not Requiring, Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation and (B) Maintain Benefits Programs; and (II) Authorizing and Directing Banks to Honor All Related Checks and Electronic Payment Requests (the "Wages and Benefits Motion")*

46.     In the Wages and Benefits Motion, the Debtors seek entry of an order (a) authorizing, but not requiring, them to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the Withholding Obligations, the Reimbursement Obligations and the Other Employee Programs, (b) unless otherwise set forth in the Wages and Benefits Motion, authorizing, but not requiring, it to continue, in their sole discretion, their

plans, practices, programs and policies for current and former Employees, as applicable, as those

Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended

or supplemented from time to time, in their sole discretion, and to make payments pursuant to the

Employee Programs in the ordinary course of business, as well as to pay related administrative

obligations, (c) permitting current and former Employees holding claims under the Workers'

Compensation Programs to proceed with such claims in the appropriate judicial or administrative for a

and to permit insurers to continue to access collateral and security provided by the Debtor pursuant to

the Workers' Compensation Programs, and (d) authorizing applicable banks and other financial

institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general

disbursement accounts and automatic payroll and other transfers to the extent that those checks or

transfers relate to any of the foregoing (all capitalized terms as defined in the Wages and Benefits

Motion).

47.      If the requested relief is not granted, the Debtors' relationships with their employees

would be adversely affected and there could well be irreparable harm to the employees' morale,

dedication, confidence and cooperation. The Debtors' business hinges on its relationships with

customers, and the ability to provide superior services is vital. The employees' support for the Debtors'

efforts is critical to the success of these Chapter 11 cases. At this early stage, the Debtor simply cannot

risk the substantial damage to their business that would inevitably attend any decline in Employee

morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

48.      I believe that the relief requested in the Wages and Benefits Motion is in the best interests

of the Debtors' estates, creditors and all other parties in interest and constitutes a critical element in

achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I

respectfully submit that the Wages and Benefits Motion should be granted.

*ii.   Debtors' Motion for Entry of Interim and Final Orders Authorizing (1) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Taxes and Fees Motion</u>")*

54.    The Debtors seek entry of interim and final orders (a) authorizing, the Debtors, in their sole discretion, but not requiring them, to pay any Taxes and Fees, whether asserted prior to or after the Petition Date and (b) the Debtors' financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Covered Taxes and Fees.

55.    In connection with the normal operations of their businesses, the Debtors collect, withhold and incur sales and use taxes, employment and wage-related taxes and fees and property taxes, as well as other taxes, fees and charges described in the Taxes and Fees Motion. The Debtors remit Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities.  Taxes and Fees are remitted by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions.

56.    I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter

57.    Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

*iii.   Motion for Interim and Final Orders:  (I) Authorizing Debtors to (A) Continue Workers Compensation Program and Liability, Product, Property, and Other Insurance Programs and (B) Pay All Obligations in Respect Thereof, and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "<u>Insurance Motion</u>" )*

49.    In the Insurance Motion, the Debtors seek entry of an order authorizing (a) the Debtors to maintain, continue and renew, in their sole discretion, the Insurance Programs on an uninterrupted

basis and in accordance with the same practices and procedures as were in effect before the Petition Date, and (b) financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing (all capitalized terms as defined in the Insurance Motion).  This would include (i) paying all amounts arising under the Insurance Programs or the financing thereof, and (ii) renewing or obtaining new insurance policies as needed in the ordinary course of business.

50.    The Debtors maintain various liability, casualty, property and other insurance and reinsurance and risk control programs through several private insurance carriers in the ordinary course of the Debtors' businesses.  If the requested relief is not granted and the Insurance Programs lapse or terminate, the Debtors may well be unable to continue large portions of their operations, thereby endangering the value of the Debtors' assets and substantially harming all creditors. The Debtors believe that all material amounts related to the Insurance Programs that were due and payable on or prior to the Petition Date have been fully paid but, out of an abundance of caution and to avoid irreparable harm to its business, the Debtors seek authority to satisfy any such prepetition obligations through the Insurance Motion.

51.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, respectfully submit that the Insurance Motion should be granted.

iv.    *Debtors' Motion for Entry of an Order Authorizing (i) Debtor to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "*Cash Management Motion*")*

52.    In the Cash Management Motion, the Debtors seek entry of an order (a) authorizing, but not directing them, to (i) continue to operate their prepetition cash management system with respect to intercompany cash management and obligations, (ii) fund the operations of subsidiaries, (iii) maintain the Debtors' existing bank accounts, and (iv) maintain the Debtors' existing business forms.  Without

the requested relief, the Debtors would have great difficulty maintaining their operations, which could cause grievous harm to the Debtors and their estates.

53.     I believe that the relief requested in the Cash Management Motion is in the best   interests of the Debtors' estates, creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

     v.     *Debtors' Motion for Entry of an Order Authorizing (i) Debtor to Continue and Honor Certain Customer Programs (the "*<u>*Customer Programs Motion*</u>*")*

54.     The Debtors seek entry of an order (a) authorizing, but not directing them, to (i) continue to operate and honor certain customer programs including, without limitation, the Debtors' customer gift card system.  In the ordinary course of business, the Debtors sell customer gift cards of various denominations that can be used to pay for food and services at Debtor locations that honor such cards. Without the requested relief, the Debtors would have to dishonor these prepaid cards, which could damage customer loyalty moving forward, cause harm to the brand and cause grievous harm to the Debtors and their estates as they seek to emerge from bankruptcy.

55.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be granted.

     vi.     *Debtors' Motion for an Order Regarding Adequate Assurance of Payment for Utility Services (the "*<u>*Utilities Motion*</u>*")*

56.     In the Utilities Motion, the Debtors seek entry of an order (a) determining that the Debtors' proposed offer of deposits provide the Utility Providers listed in the Motion with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code, (b) approving

procedures for resolving requests by Utility Providers for additional or different assurances beyond those set forth in the Motion, and (c) prohibiting the Utility Providers from altering, refusing or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

57.    The Debtors currently utilize electric, cable, internet, telephone, waste removal, and water utility services in their operations provided by certain Utility Providers as described in greater detail in the Utilities Motion.

58.    Because the Utility Providers provide essential services, any interruption in such services would prove devastating to the Debtors' ability to continue their operations.  The temporary or permanent discontinuation of utility services at the Debtors' offices and related operations would severely restrict the Debtors' ability to continue operating and could cause irreparable harm. Uninterrupted utility services are essential to the Debtors' ongoing operations.

59.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

    *vii.    Assented to Motion for Entry of Interim Order Pursuant to 11 U.S.C.§§ 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(1),  364(d)(1), 364(e) and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Use of Cash Collateral (II) Granting Liens and Super-priority Claims and (III)Granting Adequate Protection to the Prepetition Secured Lender (the "Interim Cash Collateral Motion")*

60.    The Debtors have limited access to available cash to fund their ongoing operations. Absent an immediate ability to access cash, the Debtors will have no ability to continue operating, including, without limitation, funding payroll, which should be paramount to creditors in these cases.

The Debtors need the ability to pay, inter alia, the salaries of their employees and managers and other operating expenses.

5.      By the Interim Cash Collateral Motion, the Debtors, with the assent of Commerce Bank & Trust Company ("CB&T"), are seeking, on an interim and final basis, the use of Cash Collateral pursuant to the stipulation and budget submitted with the motion.  The Debtors are also seeking an order deeming CB&T, the Debtors' prepetition secured lender, adequately protected for the Debtors' use of cash collateral due to the fact that CB&T is fully secured in the other assets of the Debtors, the Debtors propose granting replacement liens in their assets as they are replenished, and the Debtors propose making payments to CB&T, to the extent practicable and permitted by the Court.  Without the immediate use of cash collateral, the Debtors will be unable to pay the expenses associated with ordinary operating expenses or fund this bankruptcy case.  Thus, Debtors' business operations will be severely disrupted.

61.      The Debtors note that, prior to the Petition Date, the Debtors and CB&T began negotiations for a DIP facility.  Pending finalization of DIP financing, CB&T has consented to the Debtors' use of Cash Collateral to fund administrative expenses incurred by the Debtors during the pendency of these chapter 11 cases.

62.      I believe that the relief requested in the Interim Cash Collateral Motion is in the best interests of the Debtors' estates, creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Interim Cash Collateral Motion should be granted.

    viii.      *Debtors' Motion for an Order Authorizing the Rejection of Certain Real Property Leases (the "Lease Rejection Motion")*

63.      In the Lease Rejection Motion, the Debtors seek entry of an order pursuant to 11 U.S.C. § 365 for authority to reject certain non-residential real property leases.

64.     The Debtors are currently counterparty to a number of real property leases that are increasingly unfavorable to the Debtors and cannot be supported by operations at the lease premise locations as described in greater detail in the Lease Rejection Motion.

65.     If the Debtors are not authorized to reject these burdensome leases, the increasing strain on operations would prove devastating to the Debtors' ability to continue their operations.

66.     I believe that the relief requested in the Lease Rejection Motion is in the best interests of the Debtors' estates, creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Rejection Motion should be granted.

ix.     *Debtors' Motion for an Order Authorizing and Approving Expedited Procedures for Assumption, Assumption and Assignment and Rejection of Contracts and Leases of Personal and Non-Residential Real Property and Abandonment of Related Personal Property  (the "Assumption/Rejection Motion")*

67.     In the Assumption/Rejection Motion, the Debtors seek entry of an order pursuant to 11 U.S.C. § 365 for authority approving an expedited process to assume, assign and reject those leases that are not being addressed in the Rejection Motion and other contracts and personal property leases to which the Debtors are counterparties.

68.     In addition to the Leases the Debtors are seeking to reject in the Rejection Motion, the Debtors are currently counterparties to a number of real property leases, contracts and other personal property leases.   In the context of their reorganization, the Debtors will need to make determinations about the economics of these contracts moving forward.  The Debtors want to have the flexibility to act with respect to the these decisions under Section 365 to avoid unnecessary administrative expenses and costs with respect to these leases and contracts.

69.     I believe that the relief requested in the Assumption/ Rejection Motion is in the best interests of the Debtors' estates, creditors and all other parties in interest and constitutes a critical

element in achieving a successful and smooth transition to Chapter 11.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Assumption/Rejection Motion should be granted.

> x.  *Debtors' Motion for Order Authorizing Retention, Employment and Compensation of Professionals in the Ordinary Course of Business Pursuant to 11 U.S.C. §§ 105(a), 327(a), 327(e), 328, and 330* (the "<u>Ordinary Course Professional Motion</u>")

70.    In the ordinary course of the business, the Debtors employed various accountants,

attorneys and other professionals to provide services to the Debtors in the ordinary course of business.

It is essential to the operation of the Debtors' business that they are permitted to retain, employ and

compensate these professionals in the post-petition period.

71.    Each such professional has a prior, prepetition relationship with the Debtors that has

allowed them to obtain expertise in and knowledge of the particular areas and matters of the Debtors'

operations for which they were responsible prior to the Petition Date.  If this expertise and knowledge is

lost, the Debtors' estates will undoubtedly incur additional and unnecessary expenses because the

Debtors will be forced to retain other professionals who have not had the benefit of a prior working

relationship with the Debtors.  Therefore, it is in the best interests of the Debtors' estates to avoid any

disruption in the professional services required in the day-to-day ordinary course operations of the

Debtors' businesses that have historically been provided by these professionals

72.    I believe that the relief requested in the Ordinary Course Professional Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful reorganization.  Accordingly, on behalf of the Debtors, I respectfully submit that the Ordinary Course Professional Motion should be granted.

I, the undersigned director for each of the above-referenced Debtors, declare under penalty of perjury that the foregoing is true and correct.

Dated: May 19, 2015

_____
Peter E. Salas, Director
Boston Restaurant Associates, Inc.